United States District Court
Northern District of Illinois
Eastern Division

CH

Overtis Sykes
Laura Barkalow
Plaintiff/petitioner
v.
United States of America
Respondent

07 CR 857
Case No ~~06~~ CR 857

Judge: Grady

FILED
MAR 06 2008
Mar 06 2008
JUDGE JOHN F. GRADY
United States District Court

# Motion to Dismiss for Lack of Jurisdiction

Now Comes Overtis Sykes and Laura Barkalow, sui Juris, hereinafter hereinafter jointly and severly "Petitioner" and moves this honorable court for an order dismissing the instant indictment due to a lack of subject matter jurisdiction in that, as established herein by judicially noticed facts and law, Three (3) Seperate and Distinct sets of facts exist which make Public Law 80-772 unconstitutional.

Therefore Title 18 USC § 3231 and 18 USC § 2113 are also unconstitutional and are null and void on there face. Therefore the indictment in case number 06 CR 857 is null and void because without a valid Statute the Court has no jurisdiction except to dismiss the cause.

The Three issues (3) are:

(1) On May 12, 1947 Congress could not have passed H.R. 3190 which later became Public Law 80-772 because they did not have

a "Quorum" to do business.

(2) When Congress is reconvened due to "President's Proclamation" (as it was in November 1947) it makes the preceding session a sine die ajournment because you can not start a new session without ending the old one.

(3) The Speaker of the House and the President pro tempore of the Senate "singed into law" public law 80-772 on June 23, 1948 After Congress had adjourned on June 20, 1948 in violation of 1 USC § 101.

Any one of these issues standing all alone would make Public Law 80-772 unconstitutional so petitioner request that each issue be responded to (seperately) as it has been the government standard practice to ignor any issue that it can not answer and/or any issue that would entitle a petitioner to win.

Petitioners also presents discovery and documentary evidence as Exhibits referenced herein and attached hereto, filed with this motion and incorporated by such reference for all purposes, as if recited verbatim herein. Petitioners further request that the government meet petitioners evidence with its own competent evidence.

Issue 1 - Congress did not have a Quoram to do business on May 12, 1947.

Like most legislative bodies, both branches of Congress have a

Quorum requirement, a provision the minimum number of members allowed to do business. Without such a requirement, a few members might meet and pass legislation, even though the voting members would represent only a small fraction of the American people.

Quorum requirement is found in the Constitution and it provides "... a Majority of each [House] shall constitute a Quorum to do business; but a smaller Number may adjourn from day to day, and may be aithorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide." Art I, Sec 5, U.S. Const.

The Quorum requirement in the House is now defined by precedent as a majority of the members who are "chosen, sworn and living." The most significant aspect of the current interpretation for the purposes of continuity of government is the provision that only the majority of the living members needs to be present for a vote rather than a majority of the whole numbers of seats. The current interpretation of the Quoram requirement would insure that Congress could operate even after a massive death toll, but it would call into question the legtimacy of any legislation passed.

H.R. 3190 which later became Public Law 80-772 which contained Title 18, the United States Code, was enacted by legislation "passed" by the House on May 12, 1947, and by the Senate on June 18, 1948. Yet, an analysis of the vote used to pass the legislation in the House shows no Quoram existed at the time the legislation was passed. In fact, while no recorded vote exist for the passage of H.R. 3190 in the

House, when a proposed amendment faced some opposition, the vote on May 12, 1947 showed that only 44 members (38 ayes and 6 noes) were present on the floor (10% of 435). Id. A true Quorum, which would have made the House passage constitutional, would have required 218 members to cast their votes. (See: 93 Cong. Rec. 5048 + 5049 attached hereto as Exhibit - 2). H.R. 3190 is null and void ab initio.

Issue 2 - Convening by "President's proclamation" and the Effect on the previous session of Congress

The government has argued in the pass that the 80th "congress continued in session from the first session to the second as if uninterrupted, and the July 1947 adjournment was not really sine die." This argument is a government loser, as Congress was reconvened by proclamation by the President in November 1947, making the adjournment sine die, because you can't start a new session without ending the old one; and then adjourned in December 1947 in a declared sine die adjournment.

To find out what effect being convened by President's proclamation has on a session of Congress, one needs to look no further than the 107th Congress House Rules Manual, which traces its roots back to Blackstone's Commentaries. (See page 1, Modes of Separation): "Prorogation or dissolution, constitutes what there is called a session; provided some act is passed. In this case, all matters pending before them are discontinued, and in there next meeting are to be taken up de novo, if taken up at all. 1 Blakst, 186.... If convened by President's proclamation, this must begin a new session, and of course, determine the preceding one to have been a session."

The sine die adjournment is further confirmed because President Truman pocket vetoed 19 bills presented to him after the first adjournment of Congress in July 1947. This could have only been done if Congress was fully adjourned sine die. (See: The Pocket Veto Case, 279 US 655 (1929).

The court recognized that reconvening by Presidents proclamation kills the previous session, but also, when this special session ends it equals sine die adjournment when the court stated: "The Senat and the House of Representatives [of the 80th Congress] adjourned on July 27, 1947, under a 'conditional final adjournment' resolution, H. Con. Res. 33; 93 Cong. Rec. 10400. Pursuant to the resolution, the two Houses were to stand in adjournment until January 2, 1948 unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a sine die adjournment, not a intrasession adjournment. On November 17, 1947, Congress convened pursuant to a proclamation of the President and adjourned sine die on December 19, 1947. The President Pocket Vetoed 19 bills presented to him after the adjournment of July 27, 1947." (Kennedy v. Sampson, 511 F.2d 430, 444 (D.C. Cir. 1974) attached hereto as Exhibit-3

Therefore as a result of being called back into session by a 'proclamation of President' Truman, both the July 27, 1947 and the December 19, 1947 adjournment were made sine die. H.R. 3190 which was not voted on by Senate at all in 1947 should have died, if not with the first adjournment of the 80th Congress on July 27, 1947, then it should have died with the sine die adjournment on December 19, 1947 and is null and void ab initio.

Issue - 3 The signing of H.R. 3190 by the Speaker of the House and the President pro tempore of the Senate violated 1 USC § 101

In accordance with H. Con. Res. 218, The Second Session of the 80th Congress (conditionally) adjourned on June 20, 1948 with H.R. 3190 still to be singed by the Speaker of the House and the President pro-tempore of the Senate. It was only after this adjournment that the Speaker of the House and President pro tempore of the Senate (unconstitutionally) signed H.R. 3190 on June 22, and 23, 1948 respectively.

1 USC § 101 specifically sets forth the required form of the enactment clause of all Acts of Congress to make them Constitutional: "The enactment clause of all acts of Congress shall be in the following form: 'Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled.'" attached as Exhibit - 4

However H.R. 3190 (Public Law 80-772) did not meet the required elements of 1 USC § 101 since it was not 'singed into law' in Congress assembled and since it was not properly passed by both houses (No Quorum in 1947).

In pass cases the government has made the arguement that "Since the President pro tempore and Speaker of the House signed the bill into law, it is unimpeachable base on the 1892 Marshall Fields case". Marshall Field + Co. v. Clark, 143 U.S. 649 (1892). That case is distinguishable because the signatures were done wile Congress was in session, and the facts are significantly different.

In fact Fields actually supports our argument:

"The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill is an official attestation by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received in due form, the sanction of the Legislative branch of the government, and that it is delivered to him in Obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. 143 U.S. at 672 (emphasis added).

Another argument the government has used in the pass is "Its in the book, so it must be real." This conclusory and circular argument is meaningless, and grounds for sanctions against those who attempt to use it.

H. R. 3190 was not singed in congress assembled, but was signed only after Congress adjourned sine die on June 20, 1948, Kennedy 511 F. 2d at 444 attached as Exhibit -3. Therefore it violated 1 USC § 101 attached hearto as exhibit - 4. Therefore the enactment clause is invalid on its face and without a proper enactment clause H. R. 3190, Public Law 80-772, 18 USC § 3231 and 18 USC § 2113 are null and void ab initio.

A.) Proof of Jurisdiction must be proven and appear on the record

It is well settled that jurisdiction is established as a threshold matter,

which springs from the nature and limits of the judicial power of the United States and is inflexible and without exception. Mansfield C+L.M.R. Co. v. Swan, 111 U.S. 379, 382, 28 L.Ed. 462, 4 S.Ct. 449 (1884); Steel Company v. Citizens for a Better Enviornment, 523 U.S. 83, 93-102, 118 S.Ct. 1003, 140 L.Ed. ███.2d 210 (1998). Rohde Island v. Massachusetts, 37 U.S. 657, 12 Pet. 657, 9 L.Ed. 1233 (1838). This principal is grounded is "two centuries of jurisprudence affirming the necessity of determining jurisdiction before proceeding to the facts." Steel Co., 523 U.S. at 98-102.

Simply stated, without Article III subject matter jurisdiction, a court can not proceed at all on a cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing this fact and dismissing the cause. Ex parte McCradle, 74 U.S. ███ 506, 514, 19 L.Ed. 264, 73 S.Ct. 318 (1868); Steel Co, 523 U.S. at 94. A litigant's failure to clear a jurisdictional hurdle can never be harmless or waived by the court. Torres v. Oakland Scavenger Co., 487 U.S. 312, 322-324, 101 L.Ed. 2d 285, 108 S.Ct. 2405 (1988).

"If the law which defines the offense and prescribes its punishment is void, the court was without jurisdiction, and the prisoner must be discharged." Ex Parte Yarborough, 110 U.S. 651, 654, 4 S.Ct. 152 28 L.Ed. ███ 274 (1884); In re Ayers, 123 U.S. 443, 31 L.Ed. 216, 8 S.Ct. 164 (1887); Fay v. Noia, 372 U.S. 391, 414, 423, 9 L.Ed. 2d 837, 83 S.Ct. 822 (1963); Ex Parte Siebold, 100 U.S. 371, 2 L.Ed. 717 (1879) (an unconstitutional act is no law at all, and no court has the right to imprison a citizen who has violated no law; such restraint even if exercised under the guise and form of law, is as subversive of the right of the citizen as if

it were exercised by a person not clothed with authority).

B.) Petitioner's have a 'Due Process' right to a hearing on these Issues

A fundamental requirement of Due Process is the opportunity to be heard at a meaningful time and in a meaningful manner. Const. Amend. V; Mathews v. Eldridge, 424 US 319, 333, 96 S. Ct. 893, 47 L.Ed. 2d 18 (1976); Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965); Hammond Packing Co. v. State of Arkansas, 212 US 322, 29 S. Ct. 370, 3 L. Ed. 530 (1909). Due Process forbids even the appearance of vindictiveness. Bordenkircher v. Hayes, 434, US 357, 362, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978).

Due Process also includes the right to introduce evidence and have judicial findings made on that evidence. Jenning v. Maloney, 404 US 25, 92 S. Ct. 180, 30 L. Ed. 2d 146 (1971); Jankins v. McKeithen, 395 US 411, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969), rehearing denied, 396 US 869 (1969). Without jurisdiction any indictment, judgement, or orders are without Due Process and ineffectual and all proceedings are VOID and of no value. 16b Am Jur 2d, Constitutional Law § 966.

Relief Sought

(1) If the government fails to respond to any of the three (3) issues raised, that the court will rule that the government has acquiescenced and dismiss the cause for lack of jurisdiction and want of prosecution;

(2) Declare indictment in case number 06 CR 857 void as a matter of law;

(3) Declare Petitioners restraint illegal contrary to the law an a direct violation of the Constitution, and the rights of Petitioner;

(4) Declare Public Law 80-772 unconstitutional

(5) Declare 18 USC § 3231 and § 2113 unconstitutional

(6) Order release of Petitioners from the care, custody and control of any United States agency.

(7) Any other relief that the court deems just and proper.

Longevity does not ensure that a statute is constitutional. "The question is not how long the parties assume a certain state of law, but whether that state of law is merely an assumption. The passage of time, the acquiescence of the parties, the assumptions of officials, even all taken together can not enact a statute." Brennan v. U.S. Postal Service, Per Marshall, J. as circuit justice, 439 U.S. 1345, 58 L.Ed 2d 51, 98 S.Ct. 22 (1978).

Respectfully submitted,

/s/ Overtis Sykes
Overtis Sykes

/s/ Laura Barkalow
Laura Barkalow

Sec.
3235. Venue in capital cases.
3236. Murder or manslaughter.
3237. Offenses begun in one district and completed in another.
3238. Offenses not committed in any district.
3239. Optional venue for espionage and related offenses.
3240. Creation of new district or division.
3241. Jurisdiction of offenses under certain sections.
3242. Indians committing certain offenses; acts on reservations.
3243. Jurisdiction of State of Kansas over offenses committed by or against Indians on Indian reservations.
3244. Jurisdiction of proceedings relating to transferred offenders.

## § 3231. District courts

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

(June 25, 1948, c. 645, 62 Stat. 826.)

### HISTORICAL AND STATUTORY NOTES

**Reviser's Note**

Based on section 588d of Title 12, U.S.C., 1940 ed., Banks and Banking; Title 18, U.S.C., 1940 ed., §§ 546, 547 (Mar. 4, 1909, c. 321, §§ 326, 340, 35 Stat. 1151, 1153; Mar. 3, 1911, c. 231, § 291, 36 Stat. 1167; May 18, 1934, c. 304, § 4, 48 Stat. 783).

This section was formed by combining sections 546 and 547 of Title 18, U.S.C., 1940 ed., with section 588d of said Title 12, with no change of substance.

The language of said section 588d of Title 12 which related to bank robbery, or killing or kidnapping as an incident thereto (see section 2113 of this title), and which read "jurisdiction over any offense defined by sections 588b and 588c of this title shall not be reserved exclusively to courts of the United States" was omitted as adequately covered by this section.

**Senate Revision Amendment**

The text of this section was changed by Senate amendment. See Senate Report No. 1620, amendment No. 10, 80th Cong.

## § 3232. District of offense—(Rule)

SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Proceedings to be in district and division in which offense committed, Rule 18.

(June 25, 1948, c. 645, 62 Stat. 826.)

## § 3233. Transfer within district—(Rule)

SEE FEDERAL RULES OF CRIMINAL PROCEDURE

**Arraignment, plea, trial, sentence in district of more than one division, Rule 19.**

(June 25, 1948, c. 645, 62 Stat. 826.)

### HISTORICAL AND STATUTORY NOTES

**References in Text**

Rule 19 of the Federal Rules of Criminal Procedure, referred to in text, was rescinded Feb. 28, 1966, eff. July 1, 1966.

## § 3234. Change of venue to another district—(Rule)

SEE FEDERAL RULES OF CRIMINAL PROCEDURE

**Plea or disposal of case in district other than that in which defendant was arrested, Rule 20.**

(June 25, 1948, c. 645, 62 Stat. 826.)

## § 3235. Venue in capital cases

**The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience.**

(June 25, 1948, c. 645, 62 Stat. 826.)

### HISTORICAL AND STATUTORY NOTES

**Reviser's Note**

Based on section 101 of Title 28, U.S.C., 1940 ed., Judicial Code and Judiciary (Mar. 3, 1911, c. 231, § 40, 36 Stat. 1100). 80th Congress House Report No. 304.

## § 3236. Murder or manslaughter

In all cases of murder or manslaughter, the offense shall be deemed to have been committed at the place where the injury was inflicted, or the poison administered or other means employed which caused the death, without regard to the place where the death occurs.

(June 25, 1948, c. 645, 62 Stat. 826.)

### HISTORICAL AND STATUTORY NOTES

**Reviser's Note**

Based on Title 18, U.S.C., 1940 ed., § 553 (Mar. 4, 1909, c. 321, § 326, 35 Stat. 1152). 80th Congress House Report No. 304.

## § 3237. Offenses begun in one district and completed in another

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.



Exhibit A (1)

some addi- . Speaker, I bjection. r, reserving the mem- en oppor- ? carefully. tice in the ch in syn- what the the gentle- ROBSION] has this bill is a program. objection to the bill?

follows: raph (d) of lighway Act eighth Con- is hereby n "one year" aph and in- "two years."

engrossed d the third tion to re-

HE UNITED CRIMINAL

H. R. 3190) to positive States Code nal Proce-

objection to the bill?

the second

r, I offer an

WALTER: On "of", strike

eaker, the ard report- adopted, of the parole

ongress one Committee the legisla- ave the ef- iminal rate rfectly ap- role board. rs actually prisoners interviews. to review onal inter-

itutions in be visited rvals. So le job with d accord- compelled I am not are eli- cases no he Board eir cases;

that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 28.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

Ex-2



relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-ninth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that have assisted in the preparation of the original United States Code and every supplement and new edition of that code. These companies have worked continuously and closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committees. In turn, the companies supplemented their regular editorial staffs by engaging the services of a reviser who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and testified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by those various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through its chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in substantive law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously endorsed the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of careful and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.

This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to those numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-ninth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of procedure or objection to it, but it does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that they were purely a codification. But there are some changes in this bill (H. R. 3190). I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. Those laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of them the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. Is the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 38, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

## REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part



Ex-2



amount each year for the development of farm-to-market roads. The Commissioner of Public Roads, Mr. Thomas H. MacDonald, spoke in favor of the bill. General Fleming, Commissioner of Public Works, favored the bill. No one appeared in opposition to the bill. It was reported unanimously by the Public Works Committee. Three identical bills have been introduced in the other body by three different Senators. The President recommended the passage of such measure in his message to the Congress on January 3 of this year. This bill will not require a single dollar of appropriations from the Federal Treasury.

Mr. CASE of South Dakota. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. CASE of South Dakota. Does the extension apply to the farm-to-market roads as well as to the primary system?

Mr. CUNNINGHAM. It certainly does, as well as the development of the highways in the urban areas.

Mr. CASE of South Dakota. The bill is very much in order for two reasons. One is that the time when the Japanese war expired, creating the resolution which the gentleman has referred to before, came along in the fall, which gave the States a short year the first year.

Mr. CUNNINGHAM. Yes. No States started building highways prior to October of 1945. They lost 4 months to start with. Then, there was a lack of material and shortage of labor and high prices, which caused the program to be held up. The whole program will be retarded and the States will lose some of this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status quo until the Congress took some additional action.

Mr. COLE of New York. Mr. Speaker, I withdraw my reservation of objection.

Mr. ANGELL. Mr. Speaker, reserving the right to object, as one of the members of this committee, I had an opportunity to study this bill very carefully. The people in my particular area in the Northwest are very, very much in sympathy with this bill. I think what the chairman has said and what the gentleman from Iowa [Mr. CUNNINGHAM] has said is absolutely true, that this bill is essential for our road-building program.

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.*, That paragraph (d) of section 4 of the Federal-Aid Highway Act of 1944, Public Law 521, Seventy-eighth Congress, approved December 20, 1944, is hereby amended by striking out the term "one year" where it appears in said paragraph and inserting in lieu thereof the term "two years."

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## TO CODIFY TITLE 18 OF THE UNITED STATES CODE, CRIMES AND CRIMINAL PROCEDURE

The Clerk called the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code entitled "Crimes and Criminal Procedure."

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill the second time.

Mr. WALTER. Mr. Speaker, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: On page 434, line 11, after the word "of", strike out "three" and insert "five."

Mr. WALTER. Mr. Speaker, the amendment you have just heard reported would have the effect, if adopted, of increasing the membership of the parole board from three to five.

At the last session of the Congress one of the subcommittees of the Committee on the Judiciary, in studying the legislation which we hoped might have the effect of cutting down the criminal rate in this country, found a perfectly appalling situation in the parole board. That board of three members actually interviews upward of 10,000 prisoners each year. That is, personal interviews. In addition to that, they have to review the cases acted on after personal interviews.

There are 21 criminal institutions in the United States that must be visited by this Board at regular intervals. So they have a perfectly impossible job with the result that men are paroled according to formula who should be compelled to serve their full sentence. I am not thinking about those men who are eligible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases; that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 28.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

APPENDIX—Continued

| Congress/ Session | | Dates of Adjournment | Length of Adjournment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 64/2 | 59. | Dec. 23, 1916–Jan. 2, 1917 | 10 | 0 |
| 65/2 | 60. | Dec. 19, 1917–Jan. 3, 1918 | 15 | 0 |
| 66/1 | 61. | July 2, 1919–July 8, 1919 | 6 | 0 |
| 66/2 | 62. | Dec. 21, 1919–Jan. 5, 1920 | 15 | 0 |
| 67/2 | 63. | Dec. 23, 1921–Jan. 3, 1922 | 11 | 0 |
| 68/1 | 64. | Dec. 21, 1923–Jan. 3, 1924 | 13 | 0 |
| 68/2 | 65. | Dec. 21, 1924–Dec. 29, 1924 | 8 | 0 |
| 69/1 | 66. | Dec. 23, 1925–Jan. 4, 1926 | 12 | 0 |
| 69/2 | 67. | Dec. 23, 1926–Jan. 3, 1927 | 11 | 0 |
| 70/1 | 68. | Dec. 22, 1927–Jan. 4, 1928 | 13 | 0 |
| 70/2 | 69. | Dec. 23, 1928–Jan. 3, 1929 | 11 | 0 |
| 71/1 | 70. | June 20, 1929–Aug. 19, 1929 | 60 | 1 |
| 71/2 | 71. | Dec. 22, 1929–Jan. 6, 1930 | 15 | 0 |
| 71/3 | 72. | Dec. 21, 1930–Jan. 5, 1931 | 15 | 0 |
| 72/1 | 73. | Dec. 23, 1931–Jan. 4, 1932 | 12 | 0 |
| 74/2 | 74. | June 9, 1936–June 15, 1936 | 6 | 0 |
| 76/3 | 75. | July 12, 1940–July 22, 1940 | 10 | 0 |
| 78/1 | 76. | July 9, 1943–Sept. 14, 1943 | 67 | 3 |
| 78/2 | 77. | Apr. 2, 1944–Apr. 12, 1944 | 10 | 1 |
| | 78. | June 24, 1944–Aug. 1, 1944 | 38 | 5 |
| | 79. | Sept. 22, 1944–Nov. 14, 1944 | 53 | 1 |
| 79/1 | 80. | Aug. 2, 1945–Sept. 5, 1945 | 34 | 0 |
| 80/1 [4] | | | | |
| 80/2 [5] | | | | |
| 81/2 | 81. | Sept. 24, 1950–Nov. 27, 1950 | 64 | 6 |
| 83/2 [6] | | | | |
| 84/1 | 82. | Apr. 5, 1955–Apr. 13, 1955 | 8 | 0 |
| 84/2 | 83. | Mar. 30, 1956–Apr. 9, 1956 | 10 | 1 |
| 85/1 | 84. | Apr. 19, 1957–Apr. 29, 1957 | 10 | 0 |
| 85/2 | 85. | Apr. 4, 1958–Apr. 14, 1958 | 10 | 0 |
| 86/1 | 86. | Mar. 27, 1959–Apr. 7, 1959 | 11 | 0 |

4. The Senate and the House of Representatives adjourned on July 27, 1947 under a "conditional final adjournment" resolution, S.Con. Res. 33; 93 Cong.Rec. 10400. Pursuant to the resolution, the two Houses were to stand in adjournment until January 2, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment. On November 17, 1947, Congress convened pursuant to proclamation of President Truman, and adjourned *sine die* on December 19, 1947. The President pocket vetoed 19 bills presented to him after the adjournment of July 27, 1947.

5. The Senate and the House of Representatives adjourned on June 20, 1948, under a "conditional final adjournment" resolution, H.Con.Res. 218; 94 Cong.Rec. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment. On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The President pocket vetoed 14 bills presented to him after the adjournment of June 20, 1948.

6. The House adjourned *sine die* on August 20, 1954. Thereafter President Eisenhower pocket vetoed twenty-five bills. Although the Senate remained in session until December 2, 1954, these were not intrasession pocket vetoes since the House had already finally adjourned.